ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Plaintiff Jessie James Barnes ("Plaintiff"), proceeding pro se , is an inmate currently housed at Upstate Correctional Facility. Plaintiff brings the instant action pursuant to 42 U.S.C. § 1983, alleging that *584 defendants committed various violations of Plaintiff's state and constitutional rights while he was detained at the Monroe County Jail during 2008 and 2009.
Presently before the Court is the motion by defendants Superintendent Ronald Harling ("Harling"), Major E. Krenzer ("Krenzer"), Captain Jolly ("Jolly"), Captain Thomas ("Thomas"), Sergeant DeRosa ("DeRosa"), Sergeant McGowan ("McGowan"), Sergeant Hayes ("Hayes"), Corporal Guest ("Guest"), Corporal Knapp ("Knapp"), Corporal Cardella ("Cardella"), Corporal Amatore ("Amatore"), Corporal Kennelly ("Kennelly"), Corporal S. Peck ("Peck"), Corporal Shellard ("Shellard"), Corporal Tripoli ("Tripoli"), Deputy Scally ("Scally"), Deputy Atkins ("Atkins"), Deputy Newton ("Newton"), Deputy Willis ("Willis"), Deputy Waud ("Waud"), Deputy James Amico ("Amico"), Deputy Ellen Danehy ("Danehy"), Deputy Daly ("Daly"), Deputy Galen ("Galen"), Deputy Alberti ("Alberti"), Lipari, Horan, Kaiser, and DiMartino (collectively "Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) (Dkt. 276), Plaintiff's motion for summary judgment pursuant to Rule 56(b) (Dkt. 306), Plaintiff's motion for recusal (Dkt. 307), and Plaintiff's motion for sanctions and request for appointment of counsel (Dkt. 320).
For the following reasons, Plaintiff's motion for recusal (Dkt. 307) is denied, Defendants' motion for summary judgment (Dkt. 276) is granted in part and denied in part, Plaintiff's motion for summary judgment (Dkt. 306) is denied, and Plaintiff's motion for sanctions and request for appointment of counsel (Dkt. 320) is denied.
BACKGROUND
I. Procedural Background
Plaintiff filed his original complaint in this matter on March 22, 2010, alleging numerous causes of action against approximately 88 Defendants, along with an application to proceed in forma pauperis . (Dkt. 1, 2). On April 1, 2010, the Court granted Plaintiff leave to proceed in forma pauperis . (Dkt. 3). In that order, the Court also dismissed Defendants Ontario County and Ontario County Attorney as parties to this action. (Id. ).
On July 6, 2010, the County Defendants filed a motion to dismiss. (Dkt. 6). On July 27, 2010, the Court added Corporal Messura as a Defendant. (Dkt. 10). Plaintiff moved to amend his complaint on August 3, 2010. (Dkt. 12). On October 6, 2010, Defendants Beilein, Harrison-Ross, and Stewart filed a motion for summary judgment. (Dkt. 18). On December 27, 2010, Plaintiff filed another motion to amend his complaint. (Dkt. 27). On July 26, 2011, Plaintiff voluntarily dismissed Defendants Beilein, Harrison-Ross, Stewart, and the Citizen's Policy and Complaint Review Council, and the Court dismissed these parties with prejudice by Court order. (Dkt. 60, 61). On January 11, 2012, the Court issued an order (Dkt. 62) granting Plaintiff's motion to amend his complaint (Dkt. 27), and dismissing as moot Plaintiff's additional motion to amend (Dkt. 12) as well as the County Defendants' motion to dismiss (Dkt. 6).
On January 25, 2012, Plaintiff filed his second amended complaint. (Dkt. 64). On March 22, 2012, the Court ordered that Plaintiff's second amended complaint be amended to insert the name of Cynthia L. Muller in place of the Jane Doe nurse. (Dkt. 78). On April 10, 2012, the County Defendants filed a motion for judgment on the pleadings. (Dkt. 82). On June 6, 2012, the Court ordered that Defendants Greg Domalski, Bradley Meister, Avis Robinson, Deputy Fitzsimmons, James Amico, and Deputy Ellen Danehy be added as Defendants in place of formerly named John *585 Does. (Dkt. 92). Plaintiff filed a motion to amend his complaint on July 26, 2012. (Dkt. 96). On August 1, 2012, Defendants Mary Ann McQueeney and Debbie Scarpulla, two nurses employed by Correctional Medical Care, Inc. ("CMC"), filed a motion to dismiss the claims against them. (Dkt. 97).
On August 2, 2012, the Court granted Plaintiff's request to file a third amended complaint, making Plaintiff's third amended complaint the operative pleading for this matter. (Dkt. 99). The Court also dismissed Defendants McQueeney, Scarpulla, Bye, Showers, Schultz, Wheatley, Burns, Caviccholi, Harris, Knox, Lopez, Chance, Gallina, and Potocki in accordance with Plaintiff's voluntary dismissal of these Defendants. (Dkt. 100). The outstanding motion for judgment on the pleadings (Dkt. 82) and motion to dismiss (Dkt. 97) were denied as moot (Dkt. 99).
On February 4, 2013, the County Defendants filed a motion for judgment on the pleadings (Dkt. 119), and the remaining Defendants, Holman and Muller, filed a motion to dismiss for failure to state a claim (Dkt. 120).
The County Defendants filed a motion to stay discovery on March 7, 2013. (Dkt. 125). The remaining Defendants filed a declaration in support of this motion to stay discovery on March 13, 2013. (Dkt. 127).
On June 19, 2013, Plaintiff filed his response to Defendants' motions and requested that the County Defendants' motion be converted into a motion for summary judgment and be granted in his favor. (Dkt. 133).
On July 11, 2013, the Court dismissed Defendant Muller in accordance with Plaintiff's voluntary dismissal of this Defendant. (Dkt. 135).
The Court granted Defendants' motion to stay discovery (Dkt. 125) on September 19, 2013 (Dkt. 138). On February 13, 2014, the Honorable Charles J. Siragusa, United States District Judge for the Western District of New York, transferred this case to the undersigned. (Dkt. 141). On January 13, 2015, Plaintiff filed a motion for recusal of the undersigned. (Dkt. 142).
On February 10, 2015, the Court granted in part and denied in part the January 30, 2013, motion to dismiss (Dkt. 119), granted the February 4, 2013, motion to dismiss (Dkt. 120), denied Plaintiff's motion for summary judgment (Dkt. 133), and denied Plaintiff's motion for recusal (Dkt. 142). (Dkt. 148). The Court also lifted the stay of discovery, and defendants County of Monroe, Brooks, O'Flynn, Cececi, Kloner, Mooney, Kimball, Gatti, Pratt, Inipoli, Preston, T. Peck, Carlo, Messura, Kluth, Luther, Raby, Fitzsimmons, Palma, DiFlores, Jane Doe Nurse, Nurse Mary, Domalski, Meister, Robinson, Holman, Miller, Rizzo, and Thibuat were terminated as parties to the action. (Id. ).
The parties conducted discovery, and the remaining Defendants filed the instant motion for summary judgment on October 16, 2017. (Dkt. 276). Plaintiff filed a cross-motion for summary judgment on March 28, 2018 (Dkt. 306), and a response to Defendants' statement of material facts on April 11, 2018 (Dkt. 314). Defendants filed their response to Plaintiff's cross-motion for summary judgment on August 24, 2018 (Dkt. 335), and Plaintiff submitted a reply on September 10, 2018 (Dkt. 337).
Plaintiff filed a motion for recusal on March 29, 2018. (Dkt. 307). On April 5, 2018, Defendants filed their response to the motion for recusal. (Dkt. 313).
On May 21, 2018, Plaintiff also filed a motion for sanctions with a request for appointment of counsel. (Dkt. 320). Defendants filed their response opposing the *586 motion for sanctions on September 10, 2018. (Dkt. 336).
II. Factual Background
The following facts are taken from Defendants' Local Rule 56 Statement of Undisputed Facts (Dkt. 276-2), Plaintiff's Local Rule 56 Statement of Undisputed Facts (Dkt. 315), and their supporting documents. Where the parties specifically controvert particular facts, the Court has noted the disagreement.
A. August 7, 2008
On August 7, 2008, Plaintiff was involved in a fight with two other inmates. (Dkt. 276-2 at ¶ 3). Before the fight, Plaintiff was playing cards with inmates Trustee Eades and Tyrone Members, and Plaintiff won the pot in Eades' possession. (Id. at ¶ 5). When Plaintiff exited his cell, Eades walked up to Plaintiff and hit him on top of his head. (Id. at ¶ 6). Plaintiff then began fighting with Eades and Members, receiving multiple blows to the face and back. (Id. at ¶ 8; Dkt. 276-6). Newton was called on his radio to check the block Plaintiff was housed in and approached, ordering all inmates into their cells. (Dkt. 276-2 at ¶ 9; Dkt. 315 at ¶ 10). All inmates complied except for Plaintiff and one of the other inmates he was fighting with. (Dkt. 276-2 at ¶ 10; Dkt. 276-6). Newton attempted to call a "Code One" on his radio, but the battery was dead. (Dkt. 315 at ¶ 10). He then immediately activated the guard alarm in the west corridor of the jail, and central control paged a "Code One." (Id. ). Deputies Amico and Danehy were assigned to central control and were monitoring the video screens. (Id. at ¶ 13). Newton did not have a direct conversation with Amico or Danehy over the radio. (Id. at ¶ 15).
Newton and several other guards entered the cellblock and ordered Plaintiff and the other inmate to stop fighting. (Dkt. 276-2 at ¶ 11; Dkt. 276-6). Although the inmates stopped hitting each other, the other inmate had Plaintiff pinned to the ground when the guards approached. (Dkt. 276-6). Newton attempted to handcuff Plaintiff after the other inmate was secured, ordering Plaintiff to remain face down and to place his hands behind his back, but Plaintiff refused and instead attempted to roll over and stand up. (Dkt. 276-2 at ¶ 12; Dkt. 276-6). Newton tried to stabilize Plaintiff on the ground, but Plaintiff continued to struggle and resist efforts to be handcuffed. (Id. at ¶¶ 13-14; Dkt. 276-6). A knee strike was applied to Plaintiff's right torso, and Plaintiff was then handcuffed and escorted out of the cell block.[2] (Dkt. 276-2 at ¶ 15; Dkt. 276-6). The entire incident lasted less than one minute and 40 seconds. (Dkt. 276-2 at ¶ 20). Plaintiff's front tooth was knocked out during the altercation, and he had a gash in his upper lip. (Dkt. 306 at 5).
B. December 23, 2008
On December 23, 2008, Plaintiff was moved from a Special Housing Unit ("SHU") to a reception cell, where he was housed until December 26, 2008. (Dkt. 276-2 at ¶ 72). Plaintiff contends that when he was placed in this cell, it "was unconscionab[l]y filthy with walls covered with feces, urine, mucus and other crud and a toilet that [did] not function filled with excrement and spew all over it." (Dkt. 306 at 25). He claims that he complained about his cell 2 times to DeRosa, 5 times to Peck, 25 or 30 times to Cardella, 15 times to Kennelly, 6 times to Knapp, and 15 times to Tripoli, and that he also spoke to Jolly, *587 Horan, and Kaiser about his cell conditions. (Id. at 25-28). Despite all his complaints, Plaintiff asserts, he was never given the opportunity to clean his reception cell while he was housed there. (Id. ).
Defendants assert that after an inmate exits a reception cell and before a new inmate gets placed there, inmate trustees clean the cell. (Dkt. 276-2 at ¶ 74). Defendants further contend that if any prison guard was made aware of unsanitary conditions in Plaintiff's cell, she or he would have ordered a trustee to clean the cell or given Plaintiff the opportunity to clean the cell himself. (Id. at ¶ 75). Additionally, inmates housed in reception cells are given one hour of recreation a day, and during that time they are allowed access to cleaning materials and supplies. (Id. at ¶ 76).
C. January 19, 2009
On December 26, 2008, Plaintiff was moved from the reception cell to a mainframe cell. (Dkt. 276-2 at ¶ 31). Plaintiff asserts that before he was moved to the mainframe cell, he pleaded with Tripoli to not be placed there, and that Tripoli responded by saying, "I don't give a fuck how many times you got your ass kicked on main-frame, we have decided that you will only be placed in a cell on the mainframe and no place else, either you go to [mainframe] or I am going to put you back in SHU." (Dkt. 306 at 28). Plaintiff also alleges that he spoke to DeRosa, McGowan, Cardella, Kennelly, Knapp, Jolly, Horan, and Kaiser about being scared of moving back to mainframe. (Id. at 26-28).
Defendants contend that Plaintiff underwent a classification process when he was assigned to a mainframe cell. (Dkt. 276-2 at ¶ 31). Classification is the process of assigning inmates to appropriate housing units using screening and risk assessment criteria delineated by the New York State Commission of Corrections' Minimum Standards. (Id. at ¶¶ 32-33). The following factors are taken into account when classifying an inmate: criminal history; propensity for victimization; history of medical/mental illness; history of sex offenses; history of hostile relationships with other inmates; prior attempts at self-injury or suicide; prior escapes and attempted escapes; attitude behavior during present and prior incarceration, including any history of assaultive behavior during incarceration; and any other information which may affect the safety and welfare of the inmate or facility staff. (Id. at ¶ 35). Plaintiff underwent this classification process, and it was determined that a mainframe cell was appropriate housing. (Id. at ¶¶ 36-37). Defendants assert that an inmate would not be placed in a housing unit with inmates he has a hostile history with or who present a threat to the inmate's safety. (Id. at ¶ 38).
On January 19, 2009, Plaintiff was attacked on his cellblock by three other inmates named Anthony Smith, Mark Rogers, and Anival Williams.[3] (Dkt. 276-2 at ¶¶ 39, 41). After hearing a commotion and then seeing the inmates fighting, Willis called a "Code One" and ordered all inmates to return to their cells, which they did. (Dkt. 276-2 at ¶¶ 44-45). Waud was not on duty on January 19, 2009. (Dkt. 276-2 at ¶ 48).
Plaintiff contends that earlier that day while Smith was cutting Plaintiff's hair, Willis told Smith "none of us deputies care if [Plaintiff] gets his ass kicked ... so me like all the other sheriff deputies employed *588 here at [the Monroe County Jail] need you to kick his ass." (Dkt. 306 at 10). Plaintiff later noticed Smith again talking to Willis, and the attack happened shortly thereafter. (Id. ).
D. February 26, 2009
On February 26, 2009, Plaintiff left his cell for a short time to brush his hair. (Dkt. 276-2 at ¶ 55). While Plaintiff was gone, several inmates took items from his cell. (Id. at ¶ 56). Plaintiff confronted the inmates, and they jumped him. (Id. at ¶ 57). Waud later noticed Plaintiff bleeding and a lump over his right eye and immediately escorted him to be evaluated by a nurse. (Id. at ¶¶ 58-59).
Defendants contend that before this incident, Plaintiff lost at cards and threatened the other inmates with a shower brush. (Id. at ¶ 60). Plaintiff contends that before the theft occurred, Waud stated, "It is no wonder why all the inmates hate you, all you do is win their commissary, just like you ... always filing grievances against us deputies and jail administration, it's not a secret why you are [the] most hated person in Monroe County Jail." (Dkt. 306 at 13). Plaintiff asserts that Waud then threatened his life and told Plaintiff he was going to "have some inmates kick [Plaintiff's] ass." (Id. ). Plaintiff alleges these statements were caught on video and that the video was preserved for a misbehavior report hearing, but Defendants are withholding it. (Id. at 14).
E. March 2009 [4]
On March 2, 2009, Plaintiff was subjected to a strip search, and he submitted a grievance about the officers' conduct during that search, including that of Scally, on March 3, 2009. (Id. at 15). On March 11, 2009, McGowan and Guest were conducting a supervisor tour and a grievance investigation in the SHU, where Plaintiff was housed. (Dkt. 276-2 at ¶ 61). Scally, Atkins, Guest, Amatore, and McGowan were at the elevator gate entry to the SHU, and Guest and Amatore entered Plaintiff's cell. (Dkt. 335-1 at ¶ 46). At that time, Scally walked by Plaintiff's cell. (Id. ). Plaintiff asserts that Scally puffed his cheeks out and imitated performing oral sex. (Dkt. 276-29 at 26). Defendants contend that Plaintiff yelled, "Scally, you can suck my dick. When I get out of this cell I'm going to knock you on your ass. I am going to fuck with Scally every day until he loses his mind and opens my cell. Then I'm going to get him fired." (Dkt. 276-2 at ¶ 62). This alleged threat towards Scally violated the jail's rules and regulations. (Id. at ¶ 65). Defendants contend that Plaintiff was accordingly infracted for his violation. (Id. at ¶ 66). That day, Scally submitted an administrative segregation request for Plaintiff. (Dkt. 335-1 at ¶ 48). Plaintiff asserts that he never made such a threat, that the misbehavior report submitted was false, and that on March 12, 2009, Thomas, Horan, and Krenzer submitted and approved harsher sanctions than asked for by Scally. (Id. at ¶¶ 47-48).
On March 17, 2019, Plaintiff submitted a written request to Shellard for assistance with investigating the incident. (Dkt. 276-2 at ¶ 67). Shellard did investigate and found that Plaintiff had made threatening statements towards Scally. (Dkt. 276-2 at ¶ 68). A disciplinary hearing was held on March 28, 2009, and Plaintiff was found guilty of violating the jail's rules. (Id. at ¶ 69; Dkt. 335-1 at ¶ 53). Plaintiff was placed on administrative segregation, was restricted to *589 showering three days a week,[5] and had his exercise revoked for a 20-day period. (Dkt. 276-2 at ¶¶ 70-71). Plaintiff claims that the interaction between him and Scally on March 11, 2019, was videotaped and preserved for the disciplinary hearing, but that Defendants failed to produce the tape to Plaintiff. (Dkt. 335-1 at ¶¶ 52-53).
F. May 2, 2009
On May 2, 2009, Plaintiff was housed in the SHU. (Dkt. 276-2 at ¶ 49). Willis was on duty and conducted rounds every 15 minutes. (Id. at ¶¶ 51-52). Another inmate, Jaquane Clark, was mopping the hall. (Id. at ¶ 50; Dkt. 314 at ¶ 50). Plaintiff contends that Willis approached Clark and said he would let Clark dump dirty mop water into Plaintiff's cell, and that he would write a misbehavior report saying Plaintiff flooded his cell instead. (Dkt. 306-1 at 131). When Willis left to conduct his rounds, Clark checked Willis' office to make sure he was not there and then ran and threw a cup-full of liquid into Plaintiff's cell. (Dkt. 276-19). Plaintiff contends the liquid was urine. (Dkt. 314 at ¶ 54). Willis returned from his rounds and spoke briefly with Clark and then with Plaintiff for five minutes before returning to his office. (Dkt. 276-19). Several minutes later Plaintiff began throwing papers from his cell into the hallway. (Id. ). Willis then entered Plaintiff's cell for approximately one minute, and after Willis exited, Plaintiff proceeded to throw more papers into the hall. (Id. ). Willis spoke with another officer in the SHU hall while Clark was present, and then both guards returned to their office. (Id. ). Plaintiff contends that Willis approached Clark and told him, "Don't make it look so obvious," and to wait until Willis left for his rounds to dump the mop water. (Dkt. 306-1 at 131).
Clark approached Plaintiff's cell, spoke with him for several minutes, and then threw a bucket full of mop water into Plaintiff's cell. (Dkt. 276-2 at ¶ 50; Dkt. 314 at ¶ 50). Plaintiff contends that the mop water contained other prisoners' urine. (Dkt. 276-29 at 22). Willis was in his office when this occurred (Dkt. 276-19), and Defendants assert that he had no prior knowledge of the incident. (Dkt. 276-38 at ¶ 21). Plaintiff asserts that Willis then walked by Plaintiff's cell while Plaintiff was trying to push the water out of it, made a threatening comment to Plaintiff, and then brought Plaintiff a towel purchased by Plaintiff's mother to clean up the urine-tainted water. (Dkt. 276-29 at 22; Dkt. 306-1 at 131). Willis contends he was not aware Clark threw mop water into Plaintiff's cell. (Dkt. 276-38 at ¶ 23).[6] The New York State Commission of Correction noted in a report after the incident that Plaintiff's inventory sheet listed two towels, but that Plaintiff only had one towel in his possession, and accordingly placed a "bath towel of equal value" in his property. (Dkt. 308-2 at 126).
G. August 12, 2009
On August 12, 2009, Plaintiff was brought to the jail's visitation area for a parole hearing and placed in a no-contact room. (Dkt. 276-2 at ¶¶ 21-22; Dkt. 314 at ¶ 21). Defendants contend that Plaintiff lunged at Shellard in the no-contact room and bit him on the head, and that the only management technique used by Shellard was pushing Plaintiff on the chest, grabbing his uniform, and then stabilizing him to the ground. (Dkt. 276-2 at ¶¶ 23-24). Plaintiff contends that he was in full mechanical *590 restraints and having a conversation with Shellard while Alberti and Daly were in the room, and then Shellard grabbed the back of Plaintiff's head and rammed his face into the glass before slamming him to the floor. (Dkt. 276-29 at 13). Plaintiff asserts that he did not lunge at Shellard or bite him. (Dkt. 314 at ¶ 23). He also contends the deputies then dragged him to the elevator by his legs, and when they got on the elevator, rammed his head into the corner. (Dkt. 276-29 at 14).
When they got off the elevator, Plaintiff grabbed the gate, and Plaintiff contends that Galen started beating his hands with an object,[7] and that Plaintiff was then thrown to the ground and kicked by the deputies. (Id. ). Defendants assert the only subject management techniques they used were verbal commands, ground stabilization, and prying Plaintiff's hands from the elevator bars. (Dkt. 276-2 at ¶¶ 28-29).
Lipari was present when Plaintiff got off the elevator. (Dkt. 276-29 at 13). Plaintiff contends Lipari watched the other officers stomp and kick him while "shaking a cannister of mace with a devious smirk on his face." (Dkt. 306 at 8). Defendants on the other hand state Lipari at no time laughed during the incident "as it was a serious and dangerous situation." (Dkt. 276-37 at ¶ 22). Plaintiff suffered from shoulder burn, back pain, a headache, a swollen ankle, and swollen hands. (Dkt. 276-29 at 14-15).
H. SHU Lighting
The SHU cells have a light fixture that is four feet long with two bulbs, one of which points towards the ceiling and the other towards the bed. (Dkt. 335-1 at ¶¶ 73-74). Plaintiff contends these lights were never turned off and damaged his eyes, causing him to switch from reading glasses to bifocals. (Id. at ¶¶ 75, 85). Plaintiff submitted grievances about the lights on March 6, 2009, April 6, 2009, April 8, 2009, and May 11, 2009. (Id. at ¶¶ 75-76, 79, 81-82). Harling responded to the April 9, 2009, grievance, stating the lights were a "recognized sound correctional practice" (id. at ¶ 79), and Lipari and Harling investigated the May 11, 2009, grievance and issued a similar response (id. at ¶ 83).
Defendants assert that the Monroe County Jail is governed by the New York Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("NYMS"), and all construction at the jail must be submitted for review and approval to the State Commission of Correction. (Dkt. 276-2 at ¶¶ 80-81). The lights in the Monroe County Jail's SHU were installed around 1992, and they were built in accordance with the NYMS. (Id. at ¶¶ 82-83). The State's assessors also visit the jail annually to ensure it continues to meet the NYMS. (Id. at ¶ 84). The facility is accredited by the New York State Sheriff's Association, which has a team of three auditors who confirm facilities comply with their 166 standards. (Id. at ¶¶ 85-86). The SHU cells are lit so that staff members can adequately confirm the health and safety of the inmates at all times. (Id. at ¶¶ 78-79). Additionally, the New York State Commission of Correction, Citizen's Policy and Complaint Review Council has reviewed and upheld the lighting conditions maintained in the SHU cells. (Id. at ¶ 87).
DISCUSSION
I. Plaintiff's Motion for Recusal
In his motion for summary judgment (Dkt. 306 at 33-38; Dkt. 320 at 43-47)
*591 and motion for recusal (Dkt. 307), as well as in letters submitted to the Court (Dkt. 340; Dkt. 341), Plaintiff asks that the undersigned recuse herself from this matter pursuant to 28 U.S.C. § 455(a). Plaintiff alleges in a conclusory fashion that the undersigned has racial and prejudicial biases due to her decision following a bench trial in a separate matter, designated by case number 01-CV-6559, and an earlier decision in the instant matter that dismissed a number of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. 148), and that therefore recusal is appropriate (see, e.g. , Dkt. 306 at 34). The recusal issue is a threshold issue that must be resolved before the Court may consider any substantive motion.
"Title 28 U.S.C. § 455(a) requires a judge to recuse [her]self 'in any proceeding in which [her] impartiality might reasonably be questioned.' " Cox v. Onondaga Cty. Sheriff's Dep't , 760 F.3d 139, 150 (2d Cir. 2014) (quoting 28 U.S.C. § 455(a) ). "Recusal motions 'are committed to the sound discretion of the district court[.]' " Abidekun v. N.Y.C. Transit Auth. , No. 93-CV-5600 (FB), 1998 WL 296372, at *2 (E.D.N.Y. June 4, 1998) (quoting United States v. Conte , 99 F.3d 60, 65 (2d Cir. 1996) ). "In cases where a judge's impartiality might reasonably be questioned, the issue for consideration is not whether the judge is in fact subjectively impartial, but whether the objective facts suggest impartiality." Williams v. LaClair , No. 9:10-CV-635 (GLS/RFT), 2013 WL 1193766, at *3 (N.D.N.Y. Jan. 29, 2013) (citing Liteky v. United States , 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ), report and recommendation adopted , No. 9:10-CV-0635, 2013 WL 1193741 (N.D.N.Y. Mar. 22, 2013).
Here, the fact that the Court reached decisions unfavorable to Plaintiff provides no basis for recusal. Liteky , 510 U.S. at 555, 114 S.Ct. 1147 ("[J]udicial rulings alone almost never constitute valid basis for a bias or partiality recusal motion.... [T]hey require recusal only when they evidence such deep-seated favoritism or antagonism as would make fair judgment impossible."); Mills v. Poole , Nos. 1:06-cv-00842-MAT-VEB, 1:11-cv-00440-MAT, 2014 WL 4829437, at *6 (W.D.N.Y. Sept. 29, 2014) ("[Plaintiff]'s claims of bias and impartiality on the part of the undersigned ... are both conclusory and based entirely on his disagreement with the Court's decisions. This is an insufficient basis for recusal."). Put simply, there is no evidence justifying recusal nor is there any basis for recusal. Accordingly, Plaintiff's motion for recusal is denied.
II. Motion and Cross-Motion for Summary Judgment
A. Legal Standard
Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ).
"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" Crawford v. Franklin Credit Mgmt. Corp. , 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary *592 judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." Johnson v. Xerox Corp. , 838 F.Supp.2d 99, 103 (W.D.N.Y. 2011) (citing Celotex Corp. v. Catrett , 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Robinson v. Concentra Health Servs., Inc. , 781 F.3d 42, 44 (2d Cir. 2015) (quoting Brown v. Eli Lilly & Co. , 654 F.3d 347, 358 (2d Cir. 2011) ). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown , 654 F.3d at 358. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
B. Excessive Use of Force
Plaintiff and Defendants move for summary judgment on Plaintiff's § 1983 claims of excessive use of force as to the alleged incidents of August 7, 2008, and August 12, 2009. "To state a § 1983 claim, a plaintiff must allege that defendant, while acting 'under color of state law,' deprived Plaintiff of his constitutional or statutory rights." Cunningham v. Rodriguez , No. 01 Civ. 1123(DC), 2002 WL 31654960, at *4 (S.D.N.Y. Nov. 22, 2002) (quoting 42 U.S.C. § 1983 ). "A pretrial detainee who is subjected to excessive force may bring a claim under § 1983." Id.
"While the Eighth Amendment's protection does not apply 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." United States v. Walsh , 194 F.3d 37, 47 (2d Cir. 1999) (quoting Graham v. Connor , 490 U.S. 386, 392 n.6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ). To bring a claim for excessive use of force under the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson , --- U.S. ----, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015). Courts consider a number of factors when determining objective reasonableness, including:
the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.
Id.
1. August 7, 2008
Plaintiff contends that Defendant Newton used excessive force on Plaintiff on August 7, 2008, when Newton responded to a fight between Plaintiff and inmates Eades and Members. Plaintiff asserts that Newton jumped on Plaintiff's back, striking Plaintiff in the face and knocking out a tooth. (Dkt. 306 at 5-6). Defendants argue that Newton did not jump on Plaintiff's back or strike Plaintiff in the face, and that "Newton's conduct was consistent with legitimate penological objectives." (Dkt. 276-59 at 8-10). For the following reasons, the Court finds the force used by *593 Newton does not rise to the level of a constitutional violation as a matter of law.
As far as "the relationship between the need for the use of force and the amount of force used," Kingsley , 135 S.Ct. at 2473, the surveillance footage shows that Newton used a single knee strike on Plaintiff's back in order to restore security after an inmate fight. Corrections officers receive "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Whitley v. Albers , 475 U.S. 312, 321-22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting Bell v. Wolfish , 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ). This "deference extends to a prison security measure taken in response to an actual confrontation," and "requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." Id. at 322, 106 S.Ct. 1078 ; see also Winters v. United States , No. 10 Civ. 7571(JMF), 2013 WL 1627950, at *6 (S.D.N.Y. Apr. 16, 2013) ("As courts in this Circuit have held, corrections officers responding to prison fights act with discretion based upon their judgment and experience."); Kalwasinski v. Artuz , No. 02 CV 2582(LBS), 2003 WL 22973420, at *4 (S.D.N.Y. Dec. 18, 2003) ("[P]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (quotation omitted) ).
It is beyond dispute that "attempting to stop an inmate fight ... is a legitimate governmental objective for a [Corrections] Officer." Vargas v. N.Y.C. Dep't of Corr. , No. 17 CIV. 2544 (JGK), 2018 WL 3392873, at *3 (S.D.N.Y. July 12, 2018). Here, Plaintiff was engaged in a physical altercation with another inmate and refused to obey Newton's orders. (Dkt. 276-2 at ¶¶ 8, 12-14). Newton only used force to the extent necessary to remove the threat-as soon as Plaintiff was handcuffed, no further force was used on him.[8] (Id. at ¶ 15; Dkt. 272-6). A reasonable trier of fact could only find that Newton used a reasonable amount of force in an effort to restore institutional security. See Dobbins v. Ponte , No. 15-CV-3091 (JMF), 2017 WL 3309726, at *5 (S.D.N.Y. Aug. 2, 2017) (granting summary judgment to the defendants as to the plaintiff's Fourteenth Amendment excessive use of force claim because the plaintiff "was indisputably acting in a belligerent and defiant manner," so the court deferred "to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security" (quotations and alteration omitted) ).
*594 Additionally, Plaintiff at most suffered a minor injury that a reasonable trier of fact could not attribute to Newton. The record shows that Plaintiff's front tooth was knocked out during the incident and that he had a gash in his upper lip. (Dkt. 306 at 5). While the injuries sustained by Plaintiff, if caused by Defendants, could be enough to sustain a § 1983 claim, see Hudson v. McMillian , 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("[T]he blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not de minimis [.]"), the record shows that only the inmates who jumped Plaintiff made any contact with his face, not Newton. (Dkt. 276-6); see supra note 8. Additionally, the record does not show that Plaintiff suffered any injury as a result of the knee strike he received from Newton. See, e.g. , Flemming v. King , No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at *3 (N.D.N.Y. June 20, 2016) ("The Second Circuit has noted its agreement with other circuits that some degree of injury is ordinarily required to state a claim of excessive force." (alteration and quotation omitted) ), report and recommendation adopted , 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).
Moreover, the record before the Court demonstrates that Newton made an effort to limit the amount of force used on Plaintiff. Newton ordered Plaintiff to remain face down and to place his hands behind his back, but Plaintiff refused and instead attempted to roll over and stand up. (Dkt. 276-2 at ¶ 12; Dkt. 276-6). The verbal command issued by Newton was an effort to temper the force used on Plaintiff. See Robinson v. Viscuso , No. 10-CV-326, 2013 WL 5470013, at *8 (W.D.N.Y. Sept. 30, 2013) ("[V]erbal orders demonstrate a reasonable attempt at measured response.").
Additionally, the security problem at issue was a fight between prison inmates. It is well established that an actual confrontation between prison inmates is a serious security problem that corrections officers receive "wide-ranging deference" to address. Whitley , 475 U.S. at 321-22, 106 S.Ct. 1078 (quoting Wolfish , 441 U.S. at 547, 99 S.Ct. 1861 ).
The record before the Court also demonstrates that Newton reasonably perceived a threat from Plaintiff. Plaintiff disobeyed a direct order from Newton when just moments before he had been in a fight with other inmates (Dkt. 276-2 at ¶¶ 11-12), and Plaintiff struggled and resisted efforts to be handcuffed (id. at ¶¶ 13-14).
Looking at the record before the Court, a reasonable trier of fact could only find that no excessive force was used in the August 7, 2008, incident. Therefore, the Court grants summary judgment in favor of Defendants as to Plaintiff's August 7, 2008, excessive use of force claim.
2. August 12, 2009
Plaintiff claims that Defendants Daly, Shellard, Alberti, and Galen used excessive force on him during the August 12, 2009, encounter, and he is therefore entitled to summary judgment. (Dkt. 306 at 6-8). Defendants argue they are entitled to summary judgment because the subject management techniques they used were at most de minimus uses of force conducted in a good-faith effort to maintain discipline and to secure the area. (Dkt. 276-59 at 12). The Court finds that there are genuine issues of material fact as to this claim.
Looking at the record in the light most favorable to Plaintiff, a reasonable trier of fact could find that Shellard without provocation pushed Plaintiff face-first into a glass window; Shellard, Daly, and Alberti pushed Plaintiff to the floor where they kicked, stomped, and punched him; Alberti and Daly slammed Plaintiff's head into the elevator; Galen smashed Plaintiff's fingers *595 with a baton; and Galen, Daly, and Alberti dragged Plaintiff back to his cell. (Dkt. 276-29 at 13-15). The record shows Plaintiff suffered from shoulder burn, back pain, a headache, a swollen ankle, and swollen hands. (Id. at 14-15).
However, looking at the record in the light most favorable to Defendants, Plaintiff lunged at Shellard who then pushed Plaintiff away with both hands. (Dkt. 276-2 at ¶¶ 23-24). Plaintiff lunged at Shellard again and bit Shellard on top of his head, at which point Shellard and Daly directed Plaintiff towards the floor. (Id. ). Plaintiff struggled while ignoring Daly's orders to stop resisting. (Id. at ¶ 24). When being escorted back to his cell, Plaintiff threatened the officers, ignored their orders, and made several more attempts to bite Daly. (Id. at ¶ 27; Dkt. 276-35 at ¶ 23). Alberti had to pry Plaintiff's hands off the elevator gate, and eventually both Alberti and Daly again directed Plaintiff to the floor due to his combative behavior. (Dkt. 276-35 at ¶¶ 27, 29). Plaintiff was then escorted back to his cell. (Id. at ¶ 27). Looking at the record in this light, a reasonable trier of fact could find under the Kingsley factors that "Defendants' use of force was necessary to protect themselves from Plaintiff's violent conduct and to restore control over Plaintiff." Porter v. Goord , No. 04-CV-0485F, 2009 WL 2180580, at *11 (W.D.N.Y. July 22, 2009), aff'd , 415 F. App'x 315 (2d Cir. 2011).
The record before the Court demonstrates there are genuine issues of material fact that can only appropriately be resolved at trial. Accordingly, the motion and cross-motion for summary judgment as to Plaintiff's August 12, 2009, excessive use of force claim are both denied.
C. Conspiracy
Plaintiff and Defendants move for summary judgment as to Plaintiff's claim that Amico, Danehy, and Newton conspired against him during the events of August 7, 2008, to allow Eades and Members to attack him. (Dkt. 276-59 at 14; Dkt. 306 at 5-6). Defendants contend that Plaintiff fails to support his conspiracy claims with specifics, and therefore that he has not presented sufficient evidence to show that an improper conspiracy took place. (Dkt. 276-59 at 14). Plaintiff asserts there is evidence of a conspiracy. (Dkt. 315 at ¶¶ 3-17). For the reasons that follow, the Court grants summary judgment in favor of Defendants as to the conspiracy claim.
To state a § 1983 conspiracy claim, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson , 200 F.3d 65, 72 (2d Cir. 1999). "[W]here a plaintiff fails to produce any specific facts whatsoever to support a conspiracy allegation, a district court may ... grant summary judgment." Eastway Const. Corp. v. City of New York , 762 F.2d 243, 251 (2d Cir. 1985) (quoting Contemporary Mission, Inc. v. U.S. Postal Serv. , 648 F.2d 97, 107 (2d Cir. 1981), superseded on other grounds by Fed. R. Civ. P. 11.
The record before the Court viewed in the light most favorable to Plaintiff sets forth no specific facts that support the conspiracy allegations. Plaintiff contends there is evidence of a conspiracy because Newton had a duty to change his radio battery before his shift began, Amico and Danehy never denied having a phone conversation with Newton before the fight broke out, and Amico and Danehy do not remember seeing the incident on their monitoring screens. (Dkt. 306 at 5-6; Dkt. 320 at 34-35). Such contentions are not specific facts but rather unsubstantiated *596 allegations that do not even establish that Amico, Danehy, and Newton had a conversation over the radio or on the phone, let alone that they conspired to allow Eades and Members to attack Plaintiff. To the contrary, the undisputed evidence establishes that after Newton became aware of the fight, he immediately activated the guard alarm in the west corridor of the jail, and central control paged a "Code One." (Dkt. 315 at ¶ 10). See Leon v. Murphy , 988 F.2d 303, 311 (2d Cir. 1993) (holding allegations by the plaintiff were insufficient to defeat the defendants' summary judgment motion in a § 1983 conspiracy action where the "allegations are unsupported by any specifics, and many of them are flatly contradicted by the evidence proffered by defendants").
The Court finds that no reasonable trier of fact could find that Defendants conspired against Plaintiff in violation of his constitutional rights, and accordingly grants Defendants' summary judgment motion as to Plaintiff's conspiracy claim.
D. Failure to Protect/Intervene
Plaintiff and Defendants move for summary judgment on Plaintiff's § 1983 claims for failure to protect based on incidents alleged to have occurred on August 7, 2008, January 19, 2009, and May 2, 2009, and failure to intervene based on the events of August 12, 2009. (Dkt. 276-59 at 15-25; Dkt. 306 at 6-13)
"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen , 17 F.3d 552, 557 (2d Cir. 1994). "As opposed to deliberate indifference claims brought by post-conviction prisoners-which arise under the Eighth Amendment-claims for deliberate indifference brought by state pretrial detainees arise under the Fourteenth Amendment." Blake v. Kelly , No. 12 Civ. 7245(ER), 2014 WL 4230889, at *4 (S.D.N.Y. Aug. 26, 2014).
The Second Circuit recently altered the analysis used in Fourteenth Amendment deliberate indifference cases following the Supreme Court's decision in Kingsley , 135 S.Ct. at 2466. Under current Second Circuit law, when a pretrial detainee plaintiff brings § 1983 claims alleging deliberate indifference, including claims alleging failure to protect or intervene, the plaintiff must satisfy a two-prong test by showing: (1) "he is incarcerated under conditions posing a substantial risk of serious harm," Hayes v. N. Y. C. Dep't of Corr. , 84 F.3d 614, 620 (2d Cir. 1996), and (2) "the defendant-official acted intentionally ... or recklessly failed to act with reasonable care to mitigate the risk ... even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell v. Pineiro , 849 F.3d 17, 30, 35 (2d Cir. 2017) ; see, e.g. , Taylor v. City of New York , No. 16 Civ. 7857 (NRB), 2018 WL 1737626, at *11 (S.D.N.Y. Mar. 27, 2018) ("Although Darnell involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims."); Corley v. City of New York , No. 1:14-cv-3202-GHW, 2017 WL 4357662, at *12 (S.D.N.Y. Sept. 28, 2017) ("[T]he second prong of this claim is measured by an objective standard: whether Defendants 'knew or should have known' that a substantial risk [of] serious harm would result from their failure to intervene." (citing Darnell , 849 F.3d at 35 ) ); Molina v. County of Westchester , No. 16 CV 3421 (VB), 2017 WL 1609021, at *2-3 (S.D.N.Y. Apr. 28, 2017) (applying the deliberate indifference standard articulated in Darnell to a failure to protect claim).
*597 1. August 7, 2008
Plaintiff claims that Defendants Amico, Danehy, and Newton failed to protect him when they allowed him to be attacked by the other inmates. (Dkt. 306 at 5-6). Specifically, Plaintiff alleges that Newton premeditated the attack with the other two prisoners, and then Amico and Danehy collaborated with Newton to delay calling a Code 1. (Id. ). A reasonable trier of fact looking at the record before the Court could only find that Plaintiff's failure to protect claim regarding the August 7, 2008, incident is insufficient.
The record viewed in the light most favorable to Plaintiff does not show that Amico, Danehy, or Newton knew or should have known that the two prisoners would attack Plaintiff. As previously discussed, Plaintiff's conclusory allegations do not establish that Amico, Danehy, and Newton had a conversation over the radio or on the phone, or that they conspired to allow Eades and Members to attack Plaintiff. Nor does the record show that Defendants intentionally or recklessly delayed in calling a "Code One." To the contrary, after Newton became aware of the fight, he immediately activated the guard alarm in the west corridor of the jail, and central control paged a "Code One." (Dkt. 315 at ¶ 10). The entire incident lasted less than one minute and 40 seconds. (Dkt. 276-2 at ¶ 20).
Because a reasonable trier of fact could only find for Defendants as to the August 7, 2008, failure to protect claim, the Court grants Defendants' motion related to this incident.
2. January 19, 2009
Plaintiff alleges that Tripoli, Waud, and Willis failed to protect him when he was attacked by three inmates on January 19, 2009, because they placed him in mainframe housing on December 26, 2008, despite his protests. (Dkt. 306 at 9-11). The Court grants Defendants' summary judgment as to Waud, but finds there are genuine issues of material fact as to Tripoli and Willis.
A reasonable trier of fact could not find that Waud failed to protect Plaintiff on January 19, 2009. Waud was not responsible for inmate housing assignments between December 2008 and January 2009 (Dkt. 276-39 at ¶ 11), and he was not working on January 19, 2009, when the attack on Plaintiff occurred (id. at ¶ 13). Plaintiff does not dispute these facts. (Dkt. 314 at ¶ 48). Accordingly, the Court grants Defendants' motion as to the failure to protect claim against Waud.
However, genuine issues of material fact exist as to Tripoli and Willis. Looking at the record in the light most favorable to Plaintiff, a reasonable trier of fact could find that Plaintiff was incarcerated under conditions that posed a substantial risk of serious harm when he was moved to mainframe housing on December 26, 2008. Plaintiff contends that he knew if he was placed in mainframe housing, he would face an "imminent threat of being pummeled by a violent gang attack by multiple inmates" (Dkt. 306 at 9), and it is undisputed that three inmates attacked Plaintiff in mainframe housing on January 19, 2009 (Dkt. 276-2 at ¶¶ 39, 41).
On the other hand, looking at the record in the light most favorable to Defendants, a reasonable trier of fact could find that Plaintiff did not face conditions that posed a substantial risk of serious harm when he was moved to mainframe housing. Defendants contend that "an inmate would not be placed in a housing [unit] with other inmates [with] whom he has a history of hostile relationships or which would present a threat to the inmate's safety." (Dkt. 276-59 at 19). Additionally, Plaintiff testified at his deposition that of his three *598 attackers on January 19, 2009, he was only familiar with Smith, the jail barber. (Dkt. 276-29 at 17).
Moreover, genuine issues of material fact exist as to whether Defendants knew or should have known that Plaintiff was in danger of being attacked. Plaintiff asserts that before he was moved to the mainframe cell, he pleaded with Tripoli to not be placed there, and that Tripoli responded by saying, "I don't give a fuck how many times you got your ass kicked on main-frame, we have decided that you will only be placed in a cell on the mainframe and no place else, either you go to [mainframe] or I am going to put you back in SHU." (Dkt. 306 at 28). Plaintiff also alleges that he spoke to DeRosa, McGowan, Cardella, Kennelly, Knapp, Jolly, Horan, and Kaiser and told them he was scared of moving back to mainframe. (Id. at 26-28). A reasonable trier of fact could find that these alleged communications "were sufficient to put [Tripoli and Willis] on notice of a serious risk to his safety such that they needed to act to protect him from that risk." Morgan v. Dzurenda , No. 3:14-cv-966(VAB), 2017 WL 1217092, at *7 (D. Conn. Mar. 31, 2017) (denying summary judgment as to the failure to protect claim).
Defendants, in contrast, contend that Plaintiff did not tell Defendants that he was afraid of being transferred back to mainframe. (Dkt. 335-1 at 20-24). Therefore, Defendants argue, Tripoli and Willis "did not mistakenly fail to notice information that indicated an allegedly tenuous relationship between Plaintiff and any of the other inmates" because "there was no such information to notice." (Dkt. 276-59 at 20 (quotation omitted) ). Because there are genuine issues of material fact surrounding the January 19, 2009, incident, the Court denies both the motions for summary judgment as to this claim.
3. May 2, 2009
On May 2, 2009, Plaintiff claims that Defendant Willis not only failed to protect Plaintiff from having urine, feces, and dirty mop water thrown into Plaintiff's cell by inmate Clark, but that Defendant Willis also let inmate Clark out of his cell and directed him to throw these materials into Plaintiff's cell. (Dkt. 306 at 11-13). The Court finds there are genuine issues of material fact as to this claim.
Plaintiff contends that inmate Clark threw a cup filled with urine at him, and then dumped a mop bucket of dirty water that contained urine into his cell. Looking at the record in the light most favorable to Plaintiff, a reasonable trier of fact could find this constitutes a condition that poses a substantial risk of serious harm. See Hogan v. Fischer , 738 F.3d 509, 516 (2d Cir. 2013) (holding that spraying an inmate with vinegar, excrement, and machine oil is more than a de minimis use of force and rises to the level of an Eighth Amendment violation). In contrast, Defendants contend that Clark only threw a cup of water into Plaintiff's cell. (Dkt. 276-38 at ¶ 22).
Further, Plaintiff submitted a sworn affidavit from Clark where Clark states Willis approached him and told him he would let Clark dump dirty mop water into Plaintiff's cell, and that he would write a misbehavior report saying Plaintiff flooded his cell instead. (Dkt. 306-1 at 131). Clark also states Willis later told Clark, "Don't make it look so obvious," and to wait until Willis left for his rounds to dump the mop water. (Id. ). A reasonable trier of fact could find based on the record before the Court that Defendant Willis directed the dumping of the mop bucket to occur.
Defendants contend that Willis was unaware of any tension between Clark and Plaintiff, that Clark acted entirely on his own while Willis was making his rounds, *599 and that Willis had no knowledge of Clark throwing a cup of urine/water or dumping dirty mop water into Plaintiff's cell. (Dkt. 276-38 at ¶¶ 21-25). Additionally, the record shows that Plaintiff threw a stack of papers into the hall while Clark was mopping (Dkt. 276-19), which could have been the reason Clark dumped the mop water into Plaintiff's cell. The surveillance footage submitted by Defendants does little to clarify these factual disputes because it contains no audio, and therefore does not indicate what Plaintiff, Clark, and Willis said to each other during the time period in question. Therefore, the Court finds there are genuine issues of material fact and denies the motion and cross-motion for summary judgment as to this claim.
4. August 12, 2009
Plaintiff contends that during the August 12, 2009, incident, Defendant Lipari failed to intervene while Defendants Galen, Daly, and Alberti beat Plaintiff. (Dkt. 306 at 8). The Court finds there are genuine issues of material fact as to this claim.
As was previously discussed in this Decision and Order, genuine issues of material fact exist as to whether Plaintiff was subject to unconstitutionally excessive force during the incident on August 12, 2009. Additionally, genuine issues of material fact exist as to whether Lipari intentionally or recklessly failed to act with reasonable care to mitigate the risk to Plaintiff. It is undisputed that Defendant Lipari was physically present when the officers attempted to remove Plaintiff from the elevator. (Dkt. 276-37 at ¶¶ 11-20). Plaintiff contends Lipari watched the other officers stomp and kick him while "shaking a cannister of mace with a devious smirk on his face." (Dkt. 306 at 8). Defendants, on the other hand, contend that Lipari was supervising the other officers' handling of Plaintiff, was not shaking a can of mace, and at no point laughed during the incident. (Dkt. 276-37 at ¶¶ 8, 22; Dkt. 335-1 at ¶ 22). The Court finds genuine issues of material fact exist as to Lipari's conduct during the August 12, 2009, incident, and therefore denies both summary judgment motions as to this claim.
E. Retaliation
Plaintiff and Defendants move for summary judgment as to Plaintiff's February 26, 2009, and March 11, 2009, retaliation claims. (Dkt. 276-59 at 25-29; Dkt. 306 at 13-22).
"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.' " Davis v. Goord , 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker , 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds , Swierkiewicz v. Sorema N.A. , 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ). A plaintiff asserting First Amendment retaliation claims must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Davis , 320 F.3d at 352 (quoting Dawes , 239 F.3d at 492 ). "The filing of formal prisoner grievances is protected conduct under the First Amendment." Shariff v. Poole , 689 F.Supp.2d 470, 478 (W.D.N.Y. 2010) (citing Colon v. Coughlin , 58 F.3d 865, 872 (2d Cir. 1995) ).
"Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' "
*600 Gill v. Pidlypchak , 389 F.3d 379, 381 (2d Cir. 2004) (quoting Davis , 320 F.3d at 353 ). "In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill.' The issue is whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.' " Lashley v. Wakefield , 483 F.Supp.2d 297, 300 (W.D.N.Y. 2007) (quoting Gill , 389 F.3d at 381 ). "This objective inquiry is not static across contexts, but rather must be tailored to the different circumstances in which retaliation claims arise." Dawes , 239 F.3d at 493 (internal quotation omitted). "Prisoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." Davis , 320 F.3d at 353.
In evaluating whether a plaintiff has established the necessary causal connection of a retaliation claim, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." Shariff , 689 F.Supp.2d at 479. "The Second Circuit has held that temporal proximity between an inmate's grievance and disciplinary action may serve as circumstantial evidence of retaliation[.]" Candelaria v. Higley , No. 04-CV-0277(MAT), 2013 WL 104910, at *9 (W.D.N.Y. Jan. 8, 2013) (citing Colon , 58 F.3d at 872-73 ). Accordingly, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." Espinal v. Goord , 558 F.3d 119, 129 (2d Cir. 2009).
1. February 26, 2009
Plaintiff claims that on February 26, 2009, Defendant Waud permitted several inmates to steal Plaintiff's commissary and beat him up in retaliation for Plaintiff's filing of grievances. (Dkt. 306 at 13). The Court finds genuine issues of material fact exist as to this claim.
Defendants contend that before the inmates stole the commissary, Plaintiff lost at cards and threatened the other inmates with a shower brush. (Dkt. 276-2 at ¶ 60). Plaintiff contends that before the theft occurred, Waud stated, "It is no wonder why all the inmates hate you, all you do is win their commissary, just like you ... always filing grievances against us deputies and jail administration, it's not a secret why you are [the] most hated person in Monroe County Jail." (Dkt. 306 at 13). Plaintiff asserts that Waud then threatened his life and told Plaintiff he was going to "have some inmates kick [Plaintiff's] ass." (Id. ).
Plaintiff engaged in a protected activity when he filed his grievances. See Shariff , 689 F.Supp.2d at 478. Looking at the record in the light most favorable to Plaintiff, a reasonable juror could find that Waud's alleged allowance of the theft of commissary and beating of Plaintiff was an adverse action because these actions would be sufficient to chill a person of ordinary firmness from continuing to file grievances. Additionally, the record viewed in the light most favorable to Plaintiff shows that Waud did not like Plaintiff because Plaintiff filed grievances, and that Waud made statements indicating as much before the February 26, 2009, incident occurred. However, the record viewed in the light most favorable to Defendants indicates that Waud did not know about the grievances, nor did he know that Plaintiff's commissary was stolen or permit the other inmates to enter Plaintiff's cell. (Dkt. 276-39 at ¶¶ 22-27). Accordingly, the Court *601 finds there are genuine issues of material fact and denies both motions as to Plaintiff's February 26, 2009, retaliation claim.
2. March 11, 2009
Plaintiff contends the events of March 2009, demonstrate that Atkins, Scally, Guest, Amatore, and McGowan retaliated against him. (Dkt. 306 at 15-22). The Court finds genuine issues of material fact exist as to this claim.
A reasonable trier of fact looking at the record in the light most favorable to Plaintiff could find he was subjected to the adverse action of a false misbehavior report in response to his protected activity of filing a grievance against Defendant Scally. The record shows Plaintiff submitted a grievance against Scally on March 3, 2009, and that Guest and Amatore investigated the grievance on March 11, 2009, in Plaintiff's cell. (Dkt. 276-29 at 25-26). Plaintiff contends that Scally walked by and imitated performing oral sex while the investigation was being conducted. As discussed in the Court's October 12, 2016, Decision and Order, Defendant Scally's sexual comments and gestures, if they occurred, do not constitute adverse action sufficient to sustain a retaliation claim. Davis , 320 F.3d at 353 (" '[S]arcastic' comments, without more, do not constitute an adverse action."). However, Plaintiff contends that he did not threaten Scally, but Guest and Amatore immediately left the cell after Scally walked by and wrote a false misbehavior report with Scally, Atkins, and McGowan, accusing Plaintiff of threatening behavior. (Dkt. 276-29 at 26; Dkt. 306 at 19). "[A] prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of grievances." Jones v. Coughlin , 45 F.3d 677, 679-80 (2d Cir. 1995). A reasonable trier of fact could find that the misbehavior report was filed to retaliate against Plaintiff for submitting a grievance against Scally.
Defendants on the other hand contend that the misbehavior report was written because when Scally walked by, Plaintiff yelled, "Scally, you can suck my dick. When I get out of this cell I'm going to knock you on your ass. I am going to fuck with Scally every day until he loses his mind and opens my cell. Then I'm going to get him fired." (Dkt. 276-2 at ¶ 62). A reasonable trier of fact could find Plaintiff's behavior was the reason Atkins, Scally, Guest, Amatore, and McGowan filed a misbehavior report. As a result, the Court finds there are genuine issues of material fact surrounding the events of March 11, 2009, and denies both motions as to this claim.
F. Due Process
Plaintiff contends that Hayes, Horan, Jolly, McGowan, Guest, Scally, Atkins, and Krenzer violated his due process rights by falsifying a grievance report on March 11, 2009, and unlawfully imposing punishment on him at a disciplinary hearing held on March 28, 2009. (Dkt. 306 at 20-21). The Court grants Defendants' motion as to this claim for the reasons that follow.
"To establish a due process violation of the Fourteenth Amendment, an inmate must show that a government official made a deliberate decision to deprive him of his life, liberty, or property. Merely negligent conduct does not give rise to claims under the Fourteenth Amendment." Jabbar v. Fischer , 683 F.3d 54, 57 (2d Cir. 2012) (citations omitted). "The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally *602 cognizable liberty interest are well established, the contours of the requisite protections having been articulated in Wolff v. McDonnell , 418 U.S. 539, 564-69, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)." Graham v. Peters , 2013 WL 5924727, at *2 (W.D.N.Y. 2013). The constitutionally mandated due process requirements include: "(1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense." Id.
Plaintiff has brought previous litigation concerning issues that overlap with the allegations he currently makes. In Barnes v. Harling , 96 A.D.3d 1415, 945 N.Y.S.2d 901 (4th Dep't 2012), lv. denied , 19 N.Y.3d 1011, 951 N.Y.S.2d 706, 976 N.E.2d 233 (2012), Plaintiff brought an Article 78 proceeding seeking review of his placement in SHU as a result of reports from March 11, 2009, March 25, 2009, April 16, 2009, and disciplinary hearings held on March 28, 2009, April 3, 2009, April 27, 2009, and May 21, 2009. The Fourth Department found that Plaintiff was "not entitled to any of the relief he seeks," and the Court of Appeals denied Plaintiff's motion to appeal this determination. Id. The Court previously took judicial notice of these decisions from the Fourth Department. (Dkt. 148 at 31); see Stewart v. Transp. Workers Union of Greater N.Y., Local 100 , 561 F.Supp.2d 429, 435-36 (S.D.N.Y. 2008) (stating that a district court may take judicial notice of matters of public record in resolving a Rule 12(c) motion). The Court found Plaintiff's challenges to his March 11, 2009, disciplinary report and March 28, 2009, disciplinary hearing were barred by the doctrine of issue preclusion, also known as collateral estoppel. (Dkt. 148 at 33); see Shell v. Brun , 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) ("[U]nder New York law, the doctrine of collateral estoppel 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.' " (quoting Ryan v. N.Y. Tel. Co. , 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984) ) ).
There are two requirements for the application of collateral estoppel to an issue: "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." McKithen v. Brown , 481 F.3d 89, 105 (2d Cir. 2007), cert. denied 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008) (quotation omitted).
"To determine whether the first action provided a full and fair opportunity to litigate requires consideration of: the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation." Shell v. Brun , 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005).
Here, the state court has already examined Plaintiff's challenges to the March 11, 2009, disciplinary report and March 28, 2009, disciplinary hearing. As Plaintiff was given a full opportunity to litigate these issues in his Article 78 proceedings, and since the same issue at play in his due process claim was actually and necessarily *603 decided in the state court proceeding, Plaintiff's due process claim must be dismissed as barred by the doctrine of collateral estoppel.
G. Unconstitutional Conditions of Confinement
Plaintiff and Defendants move for summary judgment as to Plaintiff's unconstitutional conditions of confinement claim for the reception cell he was housed in from December 23 to 26, 2008, and for the lighting conditions in his SHU cell. (Dkt. 276-59 at 32-37; Dkt. 306 at 25-33).
"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." Darnell , 849 F.3d at 29. To prevail on an unconstitutional conditions of confinement claim, the plaintiff must show the conditions were "sufficiently serious to constitute objective deprivations of the right to due process." Id. Additionally, the plaintiff must demonstrate that the defendant "acted with at least deliberate indifference to the challenged conditions." Id. For a pretrial detainee to prove a claim based on deliberate indifference to conditions of confinement, the inmate:
must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.
Id. at 35 ; see Castro v. County of Los Angeles , 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc) ("The underlying federal right, as well as the nature of the harm suffered, is the same for pretrial detainees' excessive force and failure-to-protect claims."). When evaluating an unconstitutional conditions of confinement claim for objective deprivations under the Fourteenth Amendment, each condition "must be measured by its severity and duration, not the resulting injury, and none ... is subject to a bright-line durational or severity threshold." Darnell , 849 F.3d at 31-32.
1. December 23, 2008
Plaintiff asserts an unconstitutional conditions of confinement claim against Jolly, Horan, Kaiser, DeRosa, McGowan, Knapp, Kennelly, Cardella, Peck, and Tripoli for placing him and keeping him in a cell with unsanitary conditions. (Dkt. 306 at 25-28). For the following reasons, the Court finds genuine issues of material fact exist as to this claim.
A reasonable trier of fact looking at the record in the light most favorable to Plaintiff could find that the conditions of his cell subjected him to a risk. "[T]he proper lens through which to analyze allegedly unconstitutional unsanitary conditions of confinement is with reference to their severity and duration, not the detainee's resulting injury." Darnell , 849 F.3d at 31. There is no "bright-line durational requirement for a viable unsanitary-conditions claim," nor is there a minimum level of unsanitariness that must be present. Willey v. Kirkpatrick , 801 F.3d 51, 68 (2d Cir. 2015) ; see Gaston v. Coughlin , 249 F.3d 156, 166 (2d Cir. 2001) ("We are unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end."). Plaintiff contends that after he was released from SHU on December 23, 2008, the cell he was placed in "was unconscionab[l]y filthy with walls covered with feces, urine, mucus and other crud and a toilet *604 that [did] not function filled with excrement and spew all over it." (Dkt. 306 at 25). If Plaintiff's cell was in such a state, a reasonable trier of fact could find the conditions were unsanitary and posed a risk to Plaintiff's health.
Defendants argue that Plaintiff has failed to show his cell was in the condition he describes, and therefore he has failed to show his cell posed an unreasonable risk of serious damage to his health. (Dkt. 276-59 at 33-34). Looking at the record in the light most favorable to Defendants, a reasonable trier of fact could find that Plaintiff's cell was not actually in an unsanitary condition-but on the other hand, a jury may credit Plaintiff's version of events.
Moreover, the record viewed in the light most favorable to Plaintiff could show that Defendants knew or should have known the conditions of Plaintiff's cell posed an excessive risk to his safety. "[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." Brock v. Wright , 315 F.3d 158, 164 (2d Cir. 2003) ; see also Garcia v. Univ. of Conn. Health Care Ctr. , No. 3:16cv852 (JCH), 2018 WL 5830840, at *12 (D. Conn. Nov. 7, 2018) (finding that the pre-trial detainee's sworn statement about the unsanitary conditions of his cell was sufficient to create a genuine issue of material fact). If the conditions were as Plaintiff describes them, a reasonable trier of fact could find the risk they posed to Plaintiff's health was obvious and that Plaintiff did not even need to tell Defendants about the conditions for there to be a constitutional violation.[9] However, Defendants assert that they were not aware of any unsanitary condition, and if they had been, they would have ensured that Plaintiff would not have remained in unsanitary conditions. (Dkt. 276-59 at 35).
Accordingly, the Court finds that there are genuine issues of material fact and denies both motions as to Plaintiff's December 23, 2008, claim for unconstitutional conditions of confinement.
2. Lighting in the SHU
Plaintiff and Defendants have both moved for summary judgment as to Plaintiff's unconstitutional conditions of confinement claim against Harling, Krenzer, Thomas, Jolly, Horan, Dimartino, and Lipari for the constant illumination of cells in the SHU. (Id. at 35-37; Dkt. 306 at 29-33). The Court grants Defendants' motion as to Plaintiff's SHU lighting claim for the reasons that follow.
Under certain circumstances, courts in this Circuit have found that night-time lighting can constitute a violation of a prisoner's Eighth Amendment rights. See, e.g. , Walker v. Schult , 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment."); Jones v. Rock , No. 9:12-cv-0447 (NAM/TWD), 2013 WL 4804500, at * 10 (N.D.N.Y. Sept. 6, 2013) ("Requiring inmates to live in constant illumination can also, under certain circumstances, rise to the level of an Eighth Amendment violation."). However, Second Circuit courts have also held that constant illumination in a confinement setting does not necessarily rise to the level of an Eighth Amendment violation. Jones v. Smith , No. 9:09-cv-1058 (GLS/ATB), 2015 WL 5750136, at *16 (N.D.N.Y. Sept. 30, 2015) (granting the defendants' motion for summary judgment as to the plaintiff's SHU lighting conditions *605 of confinement claim and finding "[i]t is well-recognized that the ability to maintain the safety of inmates and the officers is a legitimate penological interest"); Booker v. Maly , No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at *19 (N.D.N.Y. Mar. 31, 2014) ("The low wattage night light helps the officers see into the cell without disturbing the inmates. The ability to maintain the safety of the inmates and the officers is a legitimate penological interest."), aff'd , 590 F. App'x 82 (2d Cir. 2015) ; Tafari v. McCarthy , 714 F.Supp.2d 317, 368 (N.D.N.Y. 2010) ("Defendants had a legitimate penological interest in protecting both guards and inmates by keeping the lights constantly illuminated in the SHU, a place where some of the most dangerous criminals in the facility were housed."). The Court's research has found no binding precedent within this Circuit regarding constant lighting in the context of pretrial detainees.
In any event, the Court does not reach the issue of whether genuine issues of material fact exist as to Plaintiff's SHU claim because it finds that even if there are genuine issues of material fact, Defendants are entitled to qualified immunity. "Qualified immunity insulates public officials from claims for damages where their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Defore v. Premore , 86 F.3d 48, 50 (2d Cir. 1996) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ). The Court "must look to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." Ford v. McGinnis , 352 F.3d 582, 596-97 (2d Cir. 2003) (quotation omitted).
" 'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." District of Columbia v. Wesby , --- U.S. ----, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." Id. "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." Id. at 589-90 (citation and quotations omitted). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Id. at 590.
"Before a court can determine if the relevant law was clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.' " Barnes v. Fedele , 337 F.Supp.3d 227, 231 (W.D.N.Y. 2018) (quoting Wilson v. Layne , 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ). The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd , 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 741, 131 S.Ct. 2074.
During the time when Plaintiff was housed in the SHU, it was not clearly established law that subjecting inmates to constant illumination could be a violation of a constitutional right. According to the Court's research, the first case in this Circuit to broach the topic of whether constant lighting in a correctional facility *606 could constitute an unconstitutional condition of confinement was issued in 2010. See Tafari , 714 F.Supp.2d at 367 (finding "[c]onstant illumination of inmate cells can be considered an adverse action" and citing to Fifth Circuit cases as support). However, the Tafari court held that Plaintiff's lighting claims should be dismissed because "constant illumination is related to a legitimate penological concern" without addressing whether dimmer lights should be used at night. Id. at 368. Indeed, the cases in this Circuit decided since Tafari are unclear as to whether low-wattage lighting in correctional facilities at night is necessary to avoid constitutional violations. See Booker , 2014 WL 1289579, at *19 (finding that continuous lighting of the SHU with a nightlight did not violate the plaintiff's Eighth Amendment rights); Jones , 2015 WL 5750136, at *15 ("However, even if brighter than 13 watts, constant illumination of the SHU cell does not necessarily violate the Eighth Amendment.").
Plaintiff resided in the SHU from March to September of 2009 (Dkt. 306 at 33; Dkt. 308-2 at 115, 127), well before the line of cases discussing constant illumination in this Circuit were decided. Moreover, when Plaintiff's grievances regarding the lighting conditions were denied, Defendants pointed to concerns about facility safety and security as the reason for constant illumination. (Dkt. 306-3 at 17-18, 31); see Wolfish , 441 U.S. at 539, 99 S.Ct. 1861 ("[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' "); see Almighty Supreme Born Allah v. Milling , 876 F.3d 48, 55 (2d Cir. 2017) ("[I]n assessing whether restrictions on pretrial detainees comport with substantive due process, a court must decide whether the restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." (quotation and alteration omitted) ). Accordingly, the Court finds the relevant law as to the SHU lighting conditions was not clearly established at the time of Plaintiff's incarceration at the Monroe County Jail, and Defendants are entitled to qualified immunity as to this claim.
H. Qualified Immunity-Remaining Claims
Defendants assert that they are entitled to qualified immunity for all of Plaintiff's claims. (Dkt. 276-59 at 37-38). As previously discussed, the Court finds Defendants are entitled to qualified immunity as to Plaintiff's SHU lighting claim; however, a decision regarding whether Defendants are entitled to qualified immunity as to the remainder of Plaintiff's claims is inappropriate at this stage of the proceedings. Factual issues remain regarding Plaintiff's remaining excessive use of force, failure to protect, retaliation, and December 23, 2008, conditions of confinement claims. Therefore, the Court does not decide whether Defendants are entitled to qualified immunity for those claims at this time.[10] See In re State Police Litig. , 88 F.3d 111, 127 (2d Cir. 1996) ("The availability of qualified immunity depends on the resolution of these fact issues."); McDermott v. Marandi , No. 04 Civ. 2392(TPG), 2007 WL 2844961, at *1 (S.D.N.Y. Sept. 28, 2007) ("[T]here are factual issues relating to the merits of plaintiff's claim and also to the defense of qualified immunity.").
*607 III. Plaintiff's Motion for Sanctions
Plaintiff claims that Defendants spoliated evidence by deleting surveillance video footage taken on January 19, 2009, February 26, 2009, and March 11, 2009, and moves for monetary sanctions in the amount of $ 100,000 and the preclusion of testimony by Harling, Krenzer, Jolly, McGowan, Amatore, Scally, and James. (Dkt. 320 at 31-39). Plaintiff's motion is denied for the reasons that follow.
"The Second Circuit defines spoliation as 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " Taylor v. City of New York , 293 F.R.D. 601, 609 (S.D.N.Y. 2013) (quoting West v. Goodyear Tire & Rubber Co. , 167 F.3d 776, 779 (2d Cir. 1999) ). "A party seeking sanctions for spoliation of evidence must establish the following three elements: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim ... such that a reasonable trier of fact could find that it would support that claim.' " Id. (quoting Residential Funding Corp. v. DeGeorge Fin. Corp. , 306 F.3d 99, 107 (2d Cir. 2002) ).
Plaintiff has presented evidence that there was an obligation to preserve the videotapes. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Federal Exp. Corp. , 247 F.3d 423, 436 (2d Cir. 2001). Courts within this Circuit have held that in the correctional context, a duty to preserve may attach when an inmate is in a fight or when an inmate files grievances about the incident. See Alston v. Bellerose , No. 3:12-cv-00147 (CSH), 2016 WL 4098726, at *2 (D. Conn. July 28, 2016) ("Clearly, videotape of a physical altercation may be relevant to future litigation, especially inside the prison context."); Thomas v. Butkiewicus , No. 3:13-CV-747 (JCH), 2016 WL 1718368, at *10 (D. Conn. Apr. 29, 2016) (holding the defendants had a duty to preserve evidence because the plaintiff was involved in a fight with other prisoners, a portion of the surveillance tape was saved, and the plaintiff filed grievances about the incident); Taylor , 293 F.R.D. at 610 ("Defendants should have reasonably anticipated that Plaintiff would file a lawsuit ... because ... in the hundreds of other instances where inmates have been injured while in [correctional facility] custody, lawsuits by the injured inmates ... have invariably ensued.").
In both the January 19, 2009, and February 26, 2009, incidents, it is undisputed that Plaintiff was injured in a fight. (See Dkt. 276-2 at ¶ 58 (describing injuries Plaintiff received in altercation on February 26, 2009); Dkt. 306-2 at 54 (describing injuries Plaintiff received in altercation on January 19, 2009) ). There is also evidence that there was some awareness of a duty to preserve evidence-Defendants concede that the February 26, 2009, video was preserved, but cannot be retrieved due to "technical difficulties." (Dkt. 336 at 3). Additionally, Plaintiff filed a grievance regarding the March 11, 2009, incident on March 17, 2009 (Dkt. 306-3 at 2-4), and administratively appealed his hearing on March 30, 2009 (Dkt. 306-2 at 128-133). The Monroe County Sheriff's Office preserves videos for 30 days unless a hold is placed (Dkt. 336-1 at 2), and the submission of both Plaintiff's grievance and appeal fall well within this preservation period. Moreover, in Plaintiff's appeal, he raised issues related to the March 11, *608 2009, incident such as retaliation and denial of rights. (Id. ). Even though Plaintiff did not explicitly discuss his intention to file a lawsuit in the grievance and appeal, the subject matter of both should have been sufficient to give notice of a potential lawsuit.
Plaintiff has also presented some evidence that the videos were destroyed or made unavailable in at least a negligent manner. See Rabenstein v. Sealift, Inc. , 18 F.Supp.3d 343, 362 (E.D.N.Y. 2014) ("A culpable state of mind must, at a minimum, constitute simple negligence." (quotation omitted) ). "[T]he failure to implement a litigation hold is, by itself, considered grossly negligent behavior." Richard Green (Fine Paintings) v. McClendon , 262 F.R.D. 284, 291 (S.D.N.Y. 2009) ; see Zubulake v. UBS Warburg LLC , 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent.").
The videos in question were destroyed or made unavailable after the duty to preserve attached. Moreover, Defendants contend the January 19, 2009, video never existed (Dkt. 336 at ¶¶ 14-15); however, a January 29, 2009, hearing report regarding the January 19, 2009, incident notes; that the hearing officer "reviewed the video and it does show Barnes getting jumped" (Dkt. 306-2 at 73). Additionally, while the February 26, 2009, video was allegedly preserved, it could not be retrieved "due to technical difficulties." (Dkt. 336-1 at 3).
"Where, as here, evidence has been destroyed due to negligence, the party moving for sanctions bears the burden of establishing that the destroyed evidence would have been favorable to his claims." Taylor , 293 F.R.D. at 613 (citing Residential Funding , 306 F.3d at 109 ). The Court finds the videos from January 19, 2009, and March 11, 2009, would not have been favorable to Plaintiff's claims. However, the evidence from February 26, 2009, if it contains what Plaintiff alleges it does, would be favorable.
Plaintiff has failed to demonstrate that the January 19, 2009, videotape would support his failure to protect claim. Plaintiff asserts that Tripoli and Willis were aware or should have been aware of the danger they were placing Plaintiff in when they assigned him to mainframe housing in late December 2008. The January 19, 2009, video, Plaintiff contends, would have shown the inmate fight that took place on that day and that he was "jumped." (Dkt. 320 at 32). However, it is undisputed that Plaintiff was attacked by several other inmates on January 19, 2009. (Dkt. 276-2 at ¶¶ 39, 41). Plaintiff has not shown that the January 19, 2009, video would have assisted a trier of fact in determining the mental state of Tripoli and Willis in December 2008, when they assigned him to mainframe housing.
Additionally, Plaintiff has failed to demonstrate that the March 11, 2009, videotape would be favorable to his retaliation claim. Plaintiff claims that Defendants authored a false misbehavior report against Plaintiff in retaliation for a grievance filed against Scally on March 3, 2009. (Dkt. 306 at 16-17). Plaintiff asserts the video would show that on March 11, 2009, Scally imitated oral sex when he walked by Plaintiff's cell. (Dkt. 320 at 33-34). Defendants appear to concede, for the purposes of this motion, that Scally did make such a gesture. (See Dkt. 276-59 at 28-29). However, the relevant disputed issue of material fact is whether Plaintiff made the threatening statements towards Scally that the misbehavior report alleges he did. The surveillance videos maintained by the Monroe County Jail do not have sound. (See Dkt. 276-6; Dkt. 276-19). Therefore, the video *609 would not make it any less likely that Plaintiff threatened Scally, and consequently any more likely that Defendants authored a false misbehavior report.
However, Plaintiff has presented evidence that the February 26, 2009, videotape could aid his second retaliation claim. "Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence, because doing so ... would allow parties who have destroyed evidence to profit from that destruction." Residential Funding , 306 F.3d at 109 (quotation and internal alterations omitted). Plaintiff claims that on February 26, 2009, Defendant Waud permitted several inmates to steal Plaintiff's commissary and beat him up in retaliation for Plaintiff's filing of grievances. (Dkt. 306 at 13). Plaintiff contends that in addition to the inmate altercation that undisputedly took place, the February 26, 2009, video shows Waud "threatening the Plaintiff's life and stating that he is going to have some inmates kick the Plaintiff's ass." (Id. ). Again, surveillance videos maintained by the Monroe County Sheriff's Office during the time Plaintiff was in custody do not have sound. Therefore, the video would at best show Waud apparently speaking with Plaintiff. Still, if the video demonstrated that some sort of conversation took place, it may be helpful to Plaintiff's retaliation claim.
Nonetheless, Plaintiff has failed to demonstrate that Waud had control over the February 26, 2009, video, or that the defendants relevant to Plaintiff's January 19, 2009, failure to protect claim or March 11, 2009, retaliation claim had control over those videos. "[T]he obligation to preserve is attendant only upon 'the party having control over the evidence ... at the time it was destroyed.' " Butkiewicus , 2016 WL 1718368, at *11 (quoting Residential Funding , 306 F.3d at 107 ). Although the Second Circuit has not yet addressed the issue, district courts within this Circuit have denied requests for sanctions against defendant corrections officers who "had no control over the recordings, had no duty to maintain them, and were not in any way involved in the failure to preserve the evidence." Thousand v. Corrigan , No. 9:15-CV-01025 (MAD/ATB), 2017 WL 4480185, at *3 (N.D.N.Y. Oct. 6, 2017) ; see Braham v. Lantz , No. 3:08cv1564(DEW), 2014 WL 1270096, at *7 (D. Conn. Mar. 27, 2014) ("[T]he plaintiff does not show that the defendants had control over the Job Request Form and an obligation to preserve it."); Grant v. Salius , No. 3:09cv21 (JBA), 2011 WL 5826041, at *3 (D. Conn. Nov. 18, 2011) ("In light of the Second Circuit's focus in applying spoliation sanctions on parties with a duty to preserve evidence and a role in the destruction of that evidence, the Court is persuaded ... that spoliation sanctions ... are unwarranted where the party against whom sanctions are sought has not been shown to have had any responsibilities related to the maintenance, preservation, or destruction of the evidence at issue, and the loss of that evidence is instead attributable to non-parties."); see also Field Day, LLC v. County of Suffolk , No. 04-2202, 2010 WL 1286622, at *6 (E.D.N.Y. Mar. 25, 2010) ("[T]he Court finds Plaintiffs have failed to establish that Cabble, who is individually named as a defendant, spoliated evidence. Any spoliation resulting from the wiping of his hard drive is attributable solely to the County.").[11]
*610 Plaintiff has not demonstrated that defendants Waud, Tripoli, Willis, Atkins, Scally, Guest, Amatore, or McGowan had or have control over the videos or were involved in any way in the failure to preserve them. Moreover, the record suggests that the February 26, 2009, video was preserved, but it cannot be viewed due to technical issues. In other words, unlike the other videos, the record suggests that the Jail complied with its preservation obligations-but for reasons unrelated to the duty to preserve, technical issues prevent the video from presently being viewed. Under the circumstances, the Court does not believe sanctions are appropriate, and therefore Plaintiff's motion for sanctions is denied.
The Court's decision in this regard should not be misconstrued by Defendants as condoning the management of the video evidence in this case. "[T]he courts have a right to expect that litigants and counsel will take the necessary steps to ensure that relevant records are preserved when litigation is reasonably anticipated, and that such records are collected, reviewed, and produced to the opposing party." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. , 685 F.Supp.2d 456, 461 (S.D.N.Y. 2010). This motion arose because the Monroe County Sheriff's Office and its counsel were less than diligent in their efforts to preserve relevant evidence, and they should review their video preservation procedures to avoid similar occurrences in the future.
IV. Plaintiff's Request for Appointment of Counsel
Plaintiff also requested the appointment of pro bono counsel. (Dkt. 320 at 47). For the reasons set forth below, Plaintiff's request is denied.
Unlike criminal cases, there is no requirement that an indigent litigant be appointed pro bono counsel in civil matters. Burgos v. Hopkins , 14 F.3d 787, 789 (2d Cir. 1994). A court may appoint counsel within its discretion pursuant to 29 U.S.C. § 1915(e). When determining whether to appoint pro bono counsel in a civil case, a court considers:
whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.
Hodge v. Police Officers , 802 F.2d 58, 61-62 (2d Cir. 1986).
Previously, in a separate matter, counsel was appointed for Plaintiff by the Honorable Jonathan W. Feldman, United States Magistrate Judge, who found that Plaintiff had demonstrated his ability to pursue his claims without counsel, but that Plaintiff would benefit from the assistance of counsel to assess the strengths and merits of Plaintiff's claims and to narrow the issues for trial. Barnes v. Alves , No. 6:01-cv-06559, Dkt. 209 (W.D.N. Y. Aug. 3, 2006). However, Plaintiff's pro bono counsel was *611 subsequently allowed to withdraw. Id. , Dkt. 271, Dkt. 274. Among other reasons supporting the withdrawal motion was Plaintiff's alleged threatening behavior directed toward his counsel. Id. , Dkt. 262-2 at 2-3 (citing Plaintiff's letter to his former pro bono counsel wherein he states: "I am from street [sic ] I am gonna give it to you rough, raw and uncut."). Plaintiff's subsequent requests for appointment of counsel were denied in that case. Id. , Dkt. 283, Dkt. 352, Dkt. 387.
As noted in the prior decisions denying Plaintiff's requests for counsel, volunteer lawyer time is a valuable and limited commodity, and it should only be utilized for the most deserving cases. See Cooper v. A. Sargenti Co., Inc. , 877 F.2d 170, 172-73 (2d Cir. 1989). Here, not only did Plaintiff's prior treatment of his pro bono counsel lead to the withdrawal of that counsel, but Plaintiff has demonstrated that he is capable of pursuing his claims. Indeed, the undersigned presided over a prior trial where Plaintiff ably-albeit unsuccessfully-represented himself. Moreover, the remaining claims are not overly complex and the trier of fact's resolution of the claims will depend on credibility assessments as opposed to any complex factual or legal issues. Therefore, the Court finds that Plaintiff is indeed capable of proceeding pro se and denies his request for appointment of counsel.
CONCLUSION
For the foregoing reasons, Plaintiff's motion for recusal (Dkt. 307) is denied, Defendants' motion for summary judgment (Dkt. 276) is granted in part and denied in part, Plaintiff's cross-motion for summary judgment (Dkt. 306) is denied, and Plaintiff's motion for sanctions and request for appointment of counsel (Dkt. 320) is denied.[12]
The Clerk of Court is directed to terminate Defendants Newton, Amico, Danehy, Harling, Krenzer, Thomas, Dimartino, and Hayes as parties to this action.
SO ORDERED.

Plaintiff claims that Newton struck Plaintiff in the face during this altercation, and that the portion of the video showing as much was deleted. (Dkt. 306 at 6).

Plaintiff claims in his motion papers that in the late 1980s he had an assault charge pending against him for an altercation with Rogers, and that Plaintiff had a "stormy relationship" with Williams' cousin (Dkt. 314 at ¶ 43), but during his deposition he testified that of the three inmates involved, he was only familiar Smith (Dkt. 276-29 at 17).

In the February 10, 2015, Decision and Order, the Court wrote that the alleged incident occurred on March 3, 2009. (Dkt. 148 at 11). However, Plaintiff alleges in the operative Complaint that this event occurred on March 11, 2009. (Dkt. 95 at ¶ 92).

Plaintiff claims he was denied any showers for many weeks. (Dkt. 314 at ¶ 71).

The security footage submitted by Defendants (Dkt. 276-19) stops after Clark dumped the water into Plaintiff's cell.

Defendants contend that Galen was not present during the incident at all. (Dkt. 276-2 at ¶ 30).

Plaintiff contends that Defendants altered the video of this incident to delete the portion where Newton punched Plaintiff "several times" in the face. (Dkt. 306 at 6). However, the running time on the video demonstrates that the video was not altered, and the video at no point shows Newton striking Plaintiff after he was handcuffed. Therefore, the Court gives no credence to Plaintiff's conclusory assertion and relies on the events as depicted in the video. See Scott , 550 U.S. at 380-81, 127 S.Ct. 1769 (holding the lower court "should have viewed the facts in the light depicted by the videotape" because "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); Houston v. Teamsters Local 210, Affiliated Health and Ins. Fund-Vacation Fringe Ben. Fund , 27 F.Supp.3d 346, 351 (E.D.N.Y. 2014) ("[A] pro se party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment.").

Plaintiff contends that he told Defendants about the conditions repeatedly. (Dkt. 306 at 26-28).

Defendants also argue that Plaintiff's complaint should be dismissed in its entirety because it fails to state any viable cause of action. (Dkt. 276-59 at 4-6). Any such argument was addressed in the Court's February 10, 2015, Decision and Order on the motions to dismiss brought before it (Dkt. 148), and is inappropriate at this stage of the litigation.

While this Court's research found several cases where the employment relationship between the correctional agency and the defendant was found sufficient to establish a correction officer's control over the documents, they were either in the context of a document request pursuant to Rule 34-not a Rule 37 motion for sanctions, see Guillory v. Skelly , No. 12-CV-00847S( ), 2014 WL 4542468, at *8 (W.D.N.Y. Sept. 11, 2014) ; Vigliotti v. Selsky , No., 2013 WL 3354423, at *4 (W.D.N.Y. July 3, 2013), or because the evidence was destroyed in direct violation of a court order, see Wilson v. Hauck , 141 F.Supp.3d 226, 229-30 (W.D.N.Y. 2015).

Thus, the following claims remain: (1) August 12, 2009 Excessive Use of Force against Shellard, Daly, Galen, and Alberti; (2) January 19, 2009 Failure to Protect against Tripoli and Willis; (3) May 2, 2009 Failure to Protect against Willis; (4) August 12, 2009 Failure to Intervene against Lipari; (5) February 26, 2009 Retaliation against Waud; (6) March 11, 2009 Retaliation against Atkins, Scally, Guest, Amatore, and McGowan; and (7) December 23, 2008 Conditions of Confinement against Jolly, Horan, Kaiser, DeRosa, McGowan, Knapp, Kennelly, Cardella, Peck, and Tripoli.